[No. D056693. Fourth Dist., Div. One. May 24, 2011.]

In re the Marriage of MICHAEL and PAMELA HOWELL.
MICHAEL HOWELL, Appellant, v.
PAMELA HOWELL, Respondent.

## Counsel

Leigh Galyon and Stephen Temko for Appellant.

Patrick L. McCrary and Matthew M. Kremer for Respondent.

## Opinion

**BENKE, Acting P. J.**—Our Legislature in 2002 amended Family Code[1] section 1612 to invalidate any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of such support if (i) the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed or (ii) that provision is unconscionable at the time of enforcement. (§ 1612, subd. (c).)

The issue before us—which has yet to be decided in this state—is whether subdivision (c) of section 1612 applies to a premarital agreement executed before its enactment. The trial court ruled the amendment applied retroactively and invalidated a provision in the parties' 1999 agreement waiving their right to receive "future spousal support, maintenance or alimony" from the other party in the event of a dissolution of the marriage or legal separation. In making its ruling, the trial court found that the party against whom enforcement was sought had entered into and executed the agreement voluntarily, that the premarital agreement was not unconscionable and that other than the spousal support waiver provision, the premarital agreement was fully enforceable.

As we explain, we conclude the trial court erred in ruling the 2002 amendment to section 1612 applied to a premarital agreement executed before the amendment's enactment. We also conclude there is substantial evidence in the record to support the trial court's findings that the spouse

---

[1] All further statutory references are to the Family Code.

against whom enforcement was sought voluntarily entered into that agreement and that the premarital agreement was not unconscionable. Based on the law that existed at the time the parties executed their agreement, we conclude the parties' waiver of spousal support in their premarital agreement was valid and enforceable.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are mainly derived from the trial court's September 1, 2009 order entered after a bifurcated trial on the issue of the validity of the parties' premarital agreement. We adopt those facts, as supplemented appropriately.

Respondent Pamela Howell (Pamela) (at the time of trial) was 44 years old and worked as a tax assistant/bookkeeper. She was married to appellant Michael Howell (Michael), a letter carrier with the United States Postal Service.

Pamela and Michael began dating in 1997. They became engaged in 1998 and were married in mid-May 1999. They separated in late March 2008.

### 1. *Michael's Testimony*

Michael testified that he told Pamela he wanted a premarital agreement a year and a half before they married. He was already twice divorced and was happy in his relationship with Pamela without marriage. However, because Pamela wanted to get married, Michael agreed to do so if she agreed to execute a premarital agreement. Pamela knew that Michael and one of his former wives had also entered into a premarital agreement.

Michael contacted his attorney in May or June 1998, almost a year before the wedding, about preparing an agreement. Pamela provided Michael with a schedule of her assets and liabilities. At that time, Michael and Pamela had similar net incomes; although Michael annually earned about $14,000 more than Pamela, Michael was paying $400 in child support each month to a former wife, plus half of the daycare and uncovered medical expenses, combined with health insurance, union dues and mandatory retirement contributions.

Michael gave Pamela the premarital agreement in early December 1998. He told Pamela to take her time reading it and to consult an attorney. Pamela responded that she discussed the agreement with her mother and several friends and concluded it was unnecessary because Michael had "nothing" to protect. Pamela had a copy of the premarital agreement from early December 1998 until it was signed on January 30, 1999.

### 2. Pamela's Testimony

Pamela testified that Michael waited until the wedding was fully planned and paid for by Pamela and her family to discuss his desire for a premarital agreement. They argued several times over the need for a premarital agreement and Michael threatened to call off the wedding unless she signed the agreement. A few days after Michael brought up the issue of a premarital agreement, he presented Pamela with an agreement prepared by *his* attorney. Pamela had the agreement for about three days before she signed it and she did not completely understand what it provided and what rights she was waiving, including the spousal support waiver.

Pamela did not have money to hire her own attorney because of the expenses from the wedding and Michael did not offer to pay for her to consult an attorney. She signed the premarital agreement because canceling the wedding would have been a great embarrassment to her and her family. Thus, on January 30, 1999, the parties executed a premarital agreement.

### 3. Key Terms of the Parties' Premarital Agreement

The premarital agreement signed by the parties provided, among other terms, Michael was previously married twice and had one daughter; Pamela was never married and had no children; and at the time of the agreement, Michael worked as a letter carrier for the United States Postal Service and earned $38,000 annually and Pamela worked as a "processor" at a mortgage company and made $24,000 annually.

Of significance here, paragraph 5 of the agreement provided: "Pamela has been advised to obtain legal counsel. Pamela has decided not to obtain such advice of independent legal counsel and believes that without the assistance of counsel she can fully protect her legal rights regarding the [premarital] agreement. Laura H. Miller is solely Michael's attorney and as such, is representing the interests of Michael and not those of Pamela."

The parties in their agreement disclosed their interests in all real and personal property and all debts for which they were separately liable. In paragraphs 9 and 10 of the premarital agreement, the parties represented they were of "sound mind and body and have a clear understanding of the terms and the basis for the terms of this contract," they "freely and in good faith choose to enter into this marriage contract and fully intend it to be legally binding upon themselves," and they are "voluntarily entering into this Agreement without coercion, duress, or influence by any person."

Of prime importance in this case, section IV, paragraph H of the premarital agreement provided: "The parties mutually waive any right to receive future

spousal support, maintenance or alimony from the other in the event of a Dissolution of Marriage or Legal Separation."

### 4. *The Trial Court's Findings and Ruling*

At the conclusion of the bifurcated trial, the trial court found that the parties' spousal support waiver contained in their premarital agreement was unenforceable based on the retroactive application of the 2002 amendment to section 1612, and the finding that Pamela lacked independent counsel at the time she executed the agreement.

The court also found Pamela voluntarily entered into the premarital agreement: "The facts establish that the premarital agreement was prepared by Michael's attorney and that Pamela was not represented by independent legal counsel at the time the Agreement was prepared and executed. Meanwhile, the agreement states that 'Pamela has been advised to obtain legal counsel. Pamela has decided not to obtain such advice of independent legal counsel and believes that without the assistance of counsel she can fully protect her legal rights regarding the prenuptial agreement.' [Citation.] The court finds that Pamela was capable of understanding the admonition to obtain her own independent attorney, that she had sufficient time to retain counsel and that, at a minimum, she could have inquired as to the cost of having an independent attorney review the agreement.

"While Pamela reports that she did not understand the spousal support waiver, the Court has stricken the waiver based on retroactive application of the 2002 amendment to [section] 1612. The court finds that Pamela had a full understanding of the terms [of the] premarital agreement, other than the spousal support waiver. The premarital agreement was twelve pages long, was not particularly complex, involved a small estate, made full disclosure, and basically sought to maintain separate the parties' separate property interests. [Citation.]

"The evidence shows . . . Pamela had [sufficient] time to consider the premarital agreement, was fluent in the English language, was employed in the field of bookkeeping which involves keeping track of finances, and was advised to obtain an independent attorney. [¶] . . . [¶]

"The parties disagree as to when the agreement was prepared and presented to Pamela. Michael testified that he provided the agreement to Pamela on December 2, 1998 and told her to take her time reading it and to obtain an attorney. Pamela testified that two weeks before she signed the agreement on January 30, 1999, Michael told her that he wanted the parties to sign a [premarital] agreement.

"Under either of the parties' claims, Pamela had at least 14 days prior to the wedding. Under the 2002 amendment of [section] 1615[, subdivision] (c) [(discussed *post*)], it is mandatory that a party is given at least seven days to consider a premarital agreement. Here, Pamela had seven additional days to consider the agreement than that provided under the 2002 amendment. The court finds that Pamela had sufficient time to consider the [premarital] agreement and that this factor does not provide support for the contention that Pamela did not voluntarily enter the agreement.[2] [¶] . . . [¶]

"The court finds that the premarital agreement was not executed under duress, fraud, or undue influence and the parties did not lack capacity to enter into the Agreement. [¶] Pamela testified that most of the preparation for the wedding had been contracted and completed at the time that the agreement was presented and that canceling the wedding would have created great embarrassment for her and the family. The court finds that the evidence shows that a significant amount of preparation had been undertaken and that financial consequences would have been suffered if the wedding was canceled in January 1999. However, the court further finds that, at a minimum, the premarital agreement was provided to Pamela more than four months before the wedding date. In fact, given Pamela's cooperation in providing financial disclosure information for the premarital agreement, the Court finds that Pamela knew of the premarital agreement no later than December 1998, five months before the wedding. The amount of time between the presentation of the premarital agreement and the wedding diminished the coercive force of the normal desire to avoid social embarrassment or humiliation. [Citation.]

"Moreover, a related question is whether Pamela became aware of Michael's insistence on a premarital agreement at the time the parties became engaged. While Pamela testified she learned of the premarital agreement in January 1999, Michael testified he raised [that issue] a year and a half prior to the wedding and around the time that the parties first discussed marriage. Inasmuch as Michael had been divorced twice before, it was reasonable for Michael to raise the premarital agreement at the time that he was contemplating his third marriage. Under this version of the facts, Pamela learned of Michael's insistence on an agreement before any wedding plans and before any possible embarrassment in postponing or canceling the wedding. Ultimately, given the totality of the circumstances, any coercive effect created by possible embarrassment to Pamela or her family did not render the agreement involuntary.

---

[2] As discussed *post*, the trial court in its September 1, 2009 order also ruled that the 2002 amendment to section 1615 did *not* apply retroactively "based upon constitutional considerations" and its finding that "retroactive application would impair vested rights of Michael without due process of law." Although neither party in this appeal has challenged that ruling, we address it to the extent it is relevant to our discussion of whether the 2002 amendment to section 1612 applies to the premarital agreement executed by the parties in 1999.

"The evidence established that Pamela had the mental capacity to enter into a premarital agreement and there is no evidence that Pamela signed the agreement as a result of trick or deception. [¶] . . . [¶]

". . . [T]here was a full disclosure of property with Pamela aware of separate property [(e.g., a house and retirement)] that was held by Michael. In addition, there was not a great disparity in the income of the parties and their respective assets so as to establish any significant inequality of bargaining power."

The court also ruled that Pamela failed to prove the agreement was unconscionable. Specifically, it found the parties made disclosures of property within the premarital agreement and that the level of disclosure of assets and liabilities "was fair, reasonable and full. As such, it is unnecessary to consider the procedural elements or substantive elements of unconscionability where Pamela has not identified any assets or debts that Michael failed to disclose in his disclosures" attached to their agreement.

The court subsequently entered an order on November 24, 2009, requiring Michael to pay Pamela $1,015 per month as spousal support for the period of July 1, 2008, through August 2009. Beginning in September 2009 and continuing each month thereafter, Michael was ordered to pay Pamela spousal support of $1,659 per month until further order of the court. The court also found under section 2030 that there was a disparity of income and assets in Michael's favor and ordered him to pay $10,000 to Pamela for legal fees and costs.[3]

## DISCUSSION

### I

*Whether Subdivision (c) of Section 1612 Applies to a Premarital Agreement Executed Before Subdivision (c)'s Enactment*

A. *Section 1612 and Standard of Review*

In January 1999, the month the parties executed their premarital agreement, section 1612 (hereinafter, former section 1612) provided:

"(a) Parties to a premarital agreement may contract with respect to all of the following:

---

[3] Michael has not challenged on appeal this finding or the requirement he pay $10,000 to Pamela for attorney fees and costs.

"(1) The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located.

"(2) The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property.

"(3) The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event.

"(4) The making of a will, trust, or other arrangement to carry out the provisions of the agreement.

"(5) The ownership rights in and disposition of the death benefit from a life insurance policy.

"(6) The choice of law governing the construction of the agreement.

"(7) Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.

"(b) The right of a child to support may not be adversely affected by a premarital agreement." (Stats. 1992, ch. 162, § 10, p. 464, operative Jan. 1, 1994.)

 Thus, under former section 1612, when Michael and Pamela signed their premarital agreement and married there was no statutory requirement that a spouse be independently represented by counsel in order to waive spousal support. However, under subdivision (a)(7) of section 1612, a court could consider whether the subject matter of a premarital agreement violated public policy.[4]

---

[4] As noted in footnote 2 *ante*, when the Legislature in 2002 amended section 1612 it also amended section 1615. Subdivision (c) of section 1615 now provides: "(c) For the purposes of subdivision (a), it shall be deemed that a premarital agreement was not executed voluntarily unless the court finds in writing or on the record all of the following: [¶] (1) *The party against whom enforcement is sought was represented by independent legal counsel at the time of signing the agreement or, after being advised to seek independent legal counsel, expressly waived, in a separate writing, representation by independent legal counsel.* [¶] (2) The party against whom enforcement is sought had not less than seven calendar days between the time that party was first presented with the agreement and advised to seek independent legal counsel and the time the agreement was signed. [¶] (3) The party against whom enforcement is sought, if unrepresented by legal counsel, was fully informed of the terms and basic effect of the agreement as well as the rights and obligations he or she was giving up by signing the agreement, and was proficient in the language in which the explanation of the party's rights was conducted and in which the agreement was written. The explanation of the rights and obligations relinquished shall be memorialized in writing and delivered to the party prior to

In 2002, the Legislature enacted subdivision (c) of section 1612, which provides: "(c) Any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of it, is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed, or if the provision regarding spousal support is unconscionable at the time of enforcement. An otherwise unenforceable provision in a premarital agreement regarding spousal support may not become enforceable solely because the party against whom enforcement is sought was represented by independent counsel."

The question presented in this appeal is whether subdivision (c) of section 1612 applies to a premarital agreement executed before its enactment. In resolving this issue, we apply a de novo standard of review. (*Bullard v. California State Automobile Assn.* (2005) 129 Cal.App.4th 211, 217 [28 Cal.Rptr.3d 225].)

> B. *Whether Subdivision (c) of Section 1612 Clarified or Changed Existing Law*

■ As a threshold issue, we must decide whether subdivision (c) of section 1612 clarified or changed existing law. "A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment. [Citation.] However, a statute might not apply retroactively when it substantially changes the legal consequences of past actions, or upsets expectations based in prior law." (*Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 [44 Cal.Rptr.3d 223, 135 P.3d 637] (*Carter*); see also *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232, 243 [62 Cal.Rptr.2d 243, 933 P.2d 507] (*Western Security Bank*) ["[A] statute that merely *clarifies*, rather than changes, existing law does not

signing the agreement. The unrepresented party shall, on or before the signing of the premarital agreement, execute a document declaring that he or she received the information required by this paragraph and indicating who provided that information. [¶] (4) The agreement and the writings executed pursuant to paragraphs (1) and (3) were not executed under duress, fraud, or undue influence, and the parties did not lack capacity to enter into the agreement. [¶] (5) Any other factors the court deems relevant." (Italics added.) Subdivision (a) of section 1615 provides in relevant part that a "premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following: [¶] (1) That party did not execute the agreement voluntarily. [¶] (2) The agreement was unconscionable when it was executed . . . ." As we also noted *ante*, although the trial court ruled subdivision (c) of section *1612* applied retroactively to invalidate the parties' spousal support waiver provision in section IV, paragraph H of their premarital agreement, it ruled subdivision (c) of section *1615* did *not* retroactively apply to invalidate the entire agreement on the basis it was involuntarily executed by Pamela.

operate retrospectively even if applied to transactions predating its enactment" "because the true meaning of the statute remains the same."].) We thus turn to an analysis of the law before the enactment of subdivision (c) of section 1612.

Our Supreme Court in *In re Marriage of Pendleton & Fireman* (2000) 24 Cal.4th 39, 54 [99 Cal.Rptr.2d 278, 5 P.3d 839] (*Pendleton*) addressed whether enforcement of a waiver of spousal support in a premarital agreement violated public policy.[5] In ruling such a waiver was not a per se violation, the court found outdated the policy that premarital waivers of spousal support in a premarital agreement promotes dissolution. (24 Cal.4th at p. 49.) "[W]hen entered into voluntarily by parties who are aware of the effect of the agreement, a premarital waiver of spousal support does not offend contemporary public policy. Such agreements are, therefore, permitted under section 1612, subdivision (a)(7) . . . ." (*Id.* at p. 53.) Of significance to the issue before us, the court in a footnote in *Pendleton* noted that the "Legislature may, of course, *limit* the right to enter into premarital waivers of spousal support and/or *specify the circumstances in which enforcement should be denied*." (*Id.* at p. 53, fn. 12, italics added.)

As the legislative history shows (discussed *post*), in response to *Pendleton* the Legislature in 2002 amended section 1612 to include subdivision (c), which in fact limited the right of parties to enter into premarital waivers (e.g., the independent counsel requirement) and specified the circumstances in which enforcement could be denied (e.g., the spousal support waiver is unconscionable at the time of enforcement). Thus, the addition of subdivision (c) to section 1612 in 2002 did not merely clarify existing law, but rather substantially changed it. (See *Carter, supra,* 38 Cal.4th at p. 922.)

Indeed, before its enactment, there was no requirement that a party have independent counsel at the time of executing the premarital agreement in order for a waiver of spousal support to be enforceable. Instead, as *Pendleton* recognized, there was a shift in public policy towards enforcement of such provisions. Our Legislature responded by enacting subdivision (c) of section 1612.

Pamela argues that subdivision (c) of section 1612 merely clarified existing law based on the reference in *Pendleton* that both parties *in that case* were represented by independent counsel. (See *Pendleton, supra,* 24 Cal.4th at pp. 53–54.) Specifically, the court there noted: "We need not decide here whether circumstances existing at the time enforcement of a waiver of

---

[5] The provision at issue in *Pendleton* provided, inter alia: " '[B]oth parties now and forever waive, in the event of a dissolution of the marriage, all rights to any type of spousal support . . . from the other . . . .' " (*Pendleton, supra,* 24 Cal.4th at p. 41.)

spousal support is sought might make enforcement unjust. It is enough to conclude here that no public policy is violated by permitting enforcement of a waiver of spousal support executed by intelligent, well-educated persons, each of whom appears to be self-sufficient in property and earning ability, *and both of whom have the advice of counsel regarding their rights and obligations as marital partners at the time they execute the waiver.* Such a waiver does not violate public policy and is not per se unenforceable . . . ." (*Ibid.*, fn. omitted, italics added.)

Although the above language is couched in terms of public policy, the factors listed by the court—including that each party to the premarital agreement was represented by counsel—are equally, if not more, applicable to the issue *not* decided in *Pendleton*, to wit: whether the circumstances existing at the time of enforcement of the spousal support waiver provision made enforcement "unjust." (*Pendleton, supra,* 24 Cal.4th at p. 53.) In any event, the reference to both parties having advice of counsel in *Pendleton* was one of several factors the court deemed relevant to enforcement of a spousal support waiver, but unlike subdivision (c) of section 1612 enacted in 2002, was not isolated as a condition to enforcement.

In addition, in a companion case to *Pendleton* our Supreme Court in *In re Marriage of Bonds* (2000) 24 Cal.4th 1, 6 [99 Cal.Rptr.2d 252, 5 P.3d 815] (*Bonds*) held the Court of Appeal erred in determining that because one of the parties to a premarital agreement was not represented by independent counsel when the party entered into the agreement, the voluntariness of that agreement was subjected to "strict scrutiny." The court in *Bonds* instead concluded that the "circumstance that one of the parties was not represented by independent counsel is only one of several factors that must be considered in determining whether a premarital agreement was entered into voluntarily." (*Ibid.*) Thus, *Bonds* also supports the conclusion that subdivision (c) of section 1612 substantially changed existing law.

We conclude the enactment of subdivision (c) of section 1612 constituted a material change in the law regarding the enforceability of a spousal support waiver in a premarital agreement and was not merely the result of a legislative attempt to clarify the true meaning of a statute. (See *Williams v. Garcetti* (1993) 5 Cal.4th 561, 568 [20 Cal.Rptr.2d 341, 853 P.2d 507]; see also *In re Marriage of Reuling* (1994) 23 Cal.App.4th 1428, 1440 [28 Cal.Rptr.2d 726] ["A statute that creates new obligations by raising a standard of care and imposing, for the first time, a specific penalty for breach of the new standard, constitutes more than a simple clarification of existing law; it manifests an intent to change it."].)

C. *Whether the Legislature Intended Subdivision (c) of Section 1612 to Apply Retroactively*

■ The next issue is whether the Legislature intended the material change in the enforceability of a spousal support waiver to apply retroactively. "California continues to adhere to the time-honored principle . . . that in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear from extrinsic sources that the Legislature . . . must have intended a retroactive application." (*Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1208–1209 [246 Cal.Rptr. 629, 753 P.2d 585]; see also *Strauss v. Horton* (2009) 46 Cal.4th 364, 470 [93 Cal.Rptr.3d 591, 207 P.3d 48] (*Strauss*) [" '[I]n the absence of a clear legislative intent to the contrary statutory enactments apply prospectively.' "].)

Here, there is nothing on the "face of the enactment" (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 484 [99 Cal.Rptr.3d 394]) of subdivision (c) of section 1612 regarding legislative intent, much less "clear" intent (*Strauss, supra*, 46 Cal.4th at p. 470) to suggest subdivision (c) was intended to be retroactive. We thus look to its legislative history.

Our review of the legislative history shows the Legislature did not intend subdivision (c) of section 1612 to apply retroactively. In response to *Pendleton* and *Bonds*, Senator Kuehl in January 2001 introduced Senate Bill No. 78 (2001–2002 Reg. Sess.), which originally precluded a party from waiving under any circumstances spousal support in a premarital agreement. (Sen. Bill No. 78 (2001–2002 Reg. Sess.) as introduced Jan. 11, 2001, p. 2, would have modified subd. (b) of § 1612 to provide: "The right of a child *or a spouse* to support may not be adversely affected by a premarital agreement.") Senate Bill No. 78 appears to have been based in part on Assembly Judiciary Committee memoranda prepared by Donna Hershkowitz for Senator Kuehl, which analyzed *Bonds* and *Pendleton* and concluded that *Pendleton* was incorrect in determining that spousal support waivers in California were permissible and enforceable under certain circumstances. (See Assem. Com. on Judiciary, Mem. on Sen. Bill No. 78 (2001–2002 Reg. Sess.) Oct. 10, 2000, pp. 1–4; Assem. Com. on Judiciary, Mem. on Sen. Bill No. 78 (2001–2002 Reg. Sess.) Oct. 23, 2000, p. 1.)

A May 1, 2001 amendment to Senate Bill No. 78 (2001–2002 Reg. Sess.) removed the blanket prohibition against a waiver of spousal support in a premarital agreement if the party against whom enforcement is sought was

represented by "independent counsel" at the time the agreement was executed. (Sen. Bill. No. 78 (2001–2002 Reg. Sess.) as amended May 1, 2001, p. 2, italics omitted.) Senate Bill No. 78 was amended in June 2001 to allow a party to set aside a waiver of spousal support if the provision was unconscionable at the time of enforcement. (Sen. Bill No. 78 (2001–2002 Reg. Sess.) as amended June 21, 2001.)[6]

As relevant to our discussion here, a Senate Judiciary Committee analysis of the original version of Senate Bill No. 78 (2001–2002 Reg. Sess.) (which prevented the parties from waiving spousal support in a premarital agreement) noted that those opposed to the bill were concerned "over the possible retroactivity of a prohibition on spousal support waivers . . . ." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 78 (2001–2002 Reg. Sess.) as introduced Jan. 11, 2001, p. 10.) The Senate Judiciary Committee report went on to note that Senate Bill No. 78 "contains no provision for retroactive application," and cited the general rule that "laws operate prospectively unless retroactive application is provided for specifically, or unless the new legislation clarifies existing law." (*Id.* at p. 11.)[7] Thus, the legislative history of Senate Bill No. 78 supports the conclusion that the Legislature did not intend subdivision (c) of section 1612 to apply retroactively.[8]

---

[6] Senate Bill No. 78 was amended one last time in July 2001. (Sen. Bill No. 78 (2001–2002 Reg. Sess.) as amended July 17, 2001.) This amendment made nonsubstantive grammatical changes to subdivision (c) of section 1612, and it was this version of the bill that was signed by the Governor in September 2001.

[7] This legislative history provides yet another cogent argument that the Legislature's enactment of subdivision (c) of section 1612 in 2002 was not merely to clarify existing law. (See *Western Security Bank, supra,* 15 Cal.4th at p. 244 [in determining whether a statute clarified or changed the law, the courts give "due consideration" to the Legislature's intent in enacting that statute]; *In re Marriage of Fellows* (2006) 39 Cal.4th 179, 184 [46 Cal.Rptr.3d 49, 138 P.3d 200] (*Fellows*) ["The Legislature's declaration of an existing statute's meaning, while not dispositive, is a factor entitled to consideration."], citing *McClung v. Employment Development Dept.* (2004) 34 Cal.4th 467, 473 [20 Cal.Rptr.3d 428, 99 P.3d 1015].) Along these same lines, the Senate Judiciary Committee report notes that the original version of Senate Bill No. 78 (2001–2002 Reg. Sess.) was designed to "legislatively confirm that waivers of spousal support in premarital agreements are void as against public policy," in contravention of the holding in *Pendleton*. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 78 (2001–2002 Reg. Sess.) as introduced Jan. 11, 2001, p. 5.) Finally, the 2001 Summary Digest explains that Senate Bill No. 78 changed existing law, which before the bill allowed parties to a premarital agreement to "contract with respect to any matter not in violation of public policy or a statute imposing a criminal penalty," by imposing the "independent counsel" requirement in subdivision (c) of section 1612. (Legis. Counsel's Dig., Sen. Bill No. 78 (2001–2002 Reg. Sess.) Summary Dig., p. 115.)

[8] Although Michael relied on this legislative history of subdivision (c) of section 1612 in his opening brief, Pamela did not address or otherwise respond to it in her respondent's brief.

Our Supreme Court's 2006 decision in *Fellows* is not inconsistent with our decision here. Before 2002, courts applied the equitable doctrine of laches to bar the recovery of arrearages in support actions. In 2002, the Legislature enacted former section 4502, subdivision (c) (Stats. 2002, ch. 304, § 1, now codified at Fam. Code, § 291, subd. (d); see Stats. 2006, ch. 86, § 4), expressly limiting the defense of laches in actions to enforce child, family or spousal support to "any portion of the judgment owed to the state." The issue in *Fellows* was whether former section 4502, subdivision (c) applied retroactively, regardless of when the arrearages accrued. (*Fellows, supra,* 39 Cal.4th at pp. 186–187.)

Relying on subdivision (c) of section 4,[9] the court concluded that amendments to the Family Code generally apply retroactively unless otherwise provided by law. (*Fellows, supra,* 39 Cal.4th at p. 186.) As such, the court concluded the Legislature intended to give former section 4502, subdivision (c) retroactive effect.

---

[9] Section 4 provides: "(a) As used in this section: [¶] (1) 'New law' means either of the following, as the case may be: [¶] (A) The act that enacted this code. [¶] (B) The act that makes a change in this code, whether effectuated by amendment, addition, or repeal of a provision of this code. [¶] (2) 'Old law' means the applicable law in effect before the operative date of the new law. [¶] (3) 'Operative date' means the operative date of the new law. [¶] (b) This section governs the application of the new law except to the extent otherwise expressly provided in the new law. [¶] (c) Subject to the limitations provided in this section, the new law applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, commencement of a proceeding, making of an order, or taking of an action. [¶] (d) If a document or paper is filed before the operative date, the contents, execution, and notice thereof are governed by the old law and not by the new law; but subsequent proceedings taken after the operative date concerning the document or paper, including an objection or response, a hearing, an order, or other matter relating thereto is governed by the new law and not by the old law. [¶] (e) If an order is made before the operative date, or an action on an order is taken before the operative date, the validity of the order or action is governed by the old law and not by the new law. Nothing in this subdivision precludes proceedings after the operative date to modify an order made, or alter a course of action commenced, before the operative date to the extent proceedings for modification of an order or alteration of a course of action of that type are otherwise provided in the new law. [¶] (f) No person is liable for an action taken before the operative date that was proper at the time the action was taken, even though the action would be improper if taken on or after the operative date, and the person has no duty, as a result of the enactment of the new law, to take any step to alter the course of action or its consequences. [¶] (g) If the new law does not apply to a matter that occurred before the operative date, the old law continues to govern the matter notwithstanding its repeal or amendment by the new law. [¶] (h) If a party shows, and the court determines, that application of a particular provision of the new law or of the old law in the manner required by this section or by the new law would substantially interfere with the effective conduct of the proceedings or the rights of the parties or other interested persons in connection with an event that occurred or circumstance that existed before the operative date, the court may, notwithstanding this section or the new law, apply either the new law or the old law to the extent reasonably necessary to mitigate the substantial interference."

The court in *Fellows* also concluded that the exceptions to subdivision (c) of section 4 found in subdivisions (f) and (g) of that statute were inapplicable. (*Fellows, supra*, 39 Cal.4th at p. 187.) The court reasoned subdivision (c) of former section 4502 did not place any new duties on the obligor spouse because "[b]oth before and after its enactment, [the obligor spouse] had a duty to pay his [or her] child support"; the "elimination of a laches defense did not create some novel proof requirement"; and "success on a laches claim is always uncertain because it is an equitable remedy that depends on 'the facts and circumstances of the particular case.' [Citation.]" (39 Cal.4th at p. 188.)

Here, unlike the situation in *Fellows* where there were no new duties imposed on a spouse by the retroactive effect of a provision in the Family Code (e.g., former § 4502, subd. (c)), clearly if subdivision (c) of section 1612 were given retroactive effect, a new duty would be imposed on Michael and Pamela based on the requirement in section 1612, subdivision (c) that a party against whom enforcement of a spousal support waiver is sought have independent counsel *at the time of executing the waiver provision*. However, as *Pendleton* and *Bonds* show, in 1999 when Michael and Pamela executed their premarital agreement, the requirement of independent counsel was a *factor* in determining the enforceability of a spousal support waiver provision, but was not a condition to enforcement as required by the subsequent enactment of subdivision (c) of section 1612 in 2002. We thus conclude the holding and reasoning in *Fellows*, and its reliance on section 4, subdivision (c), are inapposite to the facts and circumstances presented in the case before us.[10]

In light of our decision that the Legislature did not intend subdivision (c) of section 1612 to apply retroactively, we need not decide whether the retroactive application of subdivision (c) impermissibly impaired a vested right of Michael without due process of law. (See *Fellows, supra*, 39 Cal.4th at p. 189, citing § 4, subd. (h).)

---

[10] See also Bassett, California Community Property Law (2010 ed.) section 4.34 suggesting that amendments to the premarital agreement statutes should be read as having the same prospective applicability as the adoption of the Uniform Premarital Agreement Act (§ 1600 et seq.), which, pursuant to section 1601, applies to any premarital agreement executed *on or after* January 1, 1986, and reasoning that the Supreme Court's decision in *Fellows* retroactively applying the Legislature's 2002 abolition of the defense of laches in support cases is not inconsistent with this rule because the "formalities of contracts carry a degree of reliance not applicable to an equitable defense against the obligations of parenthood."

## II

### *Enforceability of the Spousal Support Waiver in the Parties' Premarital Agreement*

█ In light of our conclusion that subdivision (c) of section 1612 does not apply to the parties' premarital agreement, we next must decide whether the parties' waiver of spousal support in that agreement was valid and enforceable. Although we apply a de novo standard of review to the issue of whether their agreement was unconscionable when executed (see former § 1615, subd. (b)),[11] in analyzing the factual findings of the court supporting that decision and the issue of voluntariness, we are bound by the substantial evidence standard of review.

Under this standard of review, we determine from the entire record whether there is substantial evidence, contradicted or uncontradicted, which supports the trial court's factual determinations. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501 [61 Cal.Rptr.3d 754].) We consider this evidence "in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving conflicts in support of the judgment." (*Employers Mutual Casualty Co. v. Philadelphia Indemnity Ins. Co.* (2008) 169 Cal.App.4th 340, 347 [86 Cal.Rptr.3d 383].)

The trial court found pursuant to former section 1615 that Pamela *voluntarily* entered into the premarital agreement. Although the facts establish that the premarital agreement was prepared by Michael's legal counsel and that Pamela was not represented by independent legal counsel at the time the agreement was executed, the agreement itself notes that Pamela was advised to obtain legal counsel but refrained from doing so because she believed she could fully protect her rights without counsel. The evidence in the record also shows that Michael recommended to Pamela that she hire her own attorney in connection with the agreement.

---

[11] Former section 1615 provided in part: "(a) A premarital agreement is not enforceable if the party against whom enforcement is sought proves either of the following: [¶] (1) That party did not execute the agreement voluntarily. [¶] (2) The agreement was unconscionable when it was executed and, before execution of the agreement, all of the following applied to that party: [¶] (A) That party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party. [¶] (B) That party did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided. [¶] (C) That party did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party. [¶] (b) An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law."

Moreover, the trial court found that Pamela was capable of understanding the admonition in the agreement to obtain her own independent counsel, that she had sufficient time to retain counsel and that, at a minimum, she could have inquired as to the cost of having independent counsel review the agreement but chose not do so.

The evidence in the record also shows that Michael gave Pamela a copy of the premarital agreement in early December 1998, that the parties did not execute that agreement until January 30, 1999, and that even under Pamela's testimony, she had two weeks to review the agreement *before* she signed it.

Other than the spousal support waiver, which the trial court struck (based on its erroneous determination that subd. (c) of § 1612 applied retroactively), the court found that Pamela had a "full understanding" of the terms of the premarital agreement. It noted that the agreement was only 12 pages long, was not particularly complex, involved a small estate, made full disclosure and basically sought to maintain separate the parties' separate property interests. We conclude these findings are supported by the evidence in the record.

The court also found that Pamela did not execute the premarital agreement under duress, fraud or undue influence. Although most of the preparation for the parties' wedding was contracted and completed at the time that the agreement was presented and that canceling the wedding would have created great embarrassment for Pamela and her family, the trial court found that Pamela knew of the premarital agreement no later than December 1998, or five months before the wedding. As a result, the trial court also found the time between the presentation of that agreement by Michael and the parties' wedding was sufficient to reduce any alleged "coercive force of the normal desire to avoid social embarrassment or humiliation."

Although Pamela claimed she learned of Michael's desire for a premarital agreement in January 1999, the trial court found Michael actually discussed a premarital agreement with Pamela about a year and a half before the wedding. (See *Fariba v. Dealer Services Corp.* (2009) 178 Cal.App.4th 156, 170–171 [100 Cal.Rptr.3d 219] ["Credibility is an issue of fact for the trier of fact to resolve [citation], and the testimony of a single witness, even a party, is sufficient to provide substantial evidence to support a factual finding [citation]."].) The court noted that Michael was divorced twice before he married Pamela. It also found it was reasonable for Michael to raise with Pamela the issue of a premarital agreement when the couple was first

contemplating marriage. Based on that finding, the court determined Pamela was aware that Michael wanted such an agreement before Pamela made any wedding plans and before Pamela and/or her family suffered any possible embarrassment in postponing or canceling the wedding.

Finally, the trial court found no evidence that Pamela signed the premarital agreement as a result of "trick or deception." The lack of any such evidence in the record also supports this finding.

Relying on former section 1615, the trial court also found that Pamela failed to prove the agreement was unconscionable at the time she signed it.[12] Specifically, it found the parties made disclosures of property within the premarital agreement, that the level of disclosure of assets and liabilities "was fair, reasonable and full" and that Pamela therefore was aware of Michael's separate property (e.g., a house and retirement). In addition, the court found, and the evidence in the record shows, that there was not a great disparity in the income of the parties and their respective assets at the time they entered into the agreement to establish any significant inequality of bargaining power.

The evidence in the record also supports the trial court's finding that Pamela was employed in the field of bookkeeping, which involves keeping track of finances, and thus was capable of understanding the financial disclosures made by Michael.

In light of the trial court's findings, which are supported by ample evidence in the record, and based on the law as it existed at the time the parties executed their premarital agreement, we conclude on this record that Pamela, despite not having independent counsel at the time she executed that agreement, knowingly and voluntarily waived her right to spousal support in that agreement. (See *Pendleton, supra*, 24 Cal.4th at p. 53 ["[W]hen entered into voluntarily by parties who are aware of the effect of the agreement, a premarital waiver of spousal support does not offend contemporary public policy."]; *Bonds, supra*, 24 Cal.4th at p. 6 [the "circumstance that one of the parties was not represented by independent counsel is only one of several factors that must be considered in determining whether a premarital agreement was entered into voluntarily."].)

---

[12] After the 2002 amendment to section 1612, a spousal support provision in a premarital agreement—including the waiver of such support—is deemed unenforceable if the provision "is unconscionable *at the time of enforcement*." (§ 1612, subd. (c), italics added.) However, under former section 1615, subdivision (a)(2), which we apply here, unconscionability is determined at the time the premarital agreement "*was executed*." (Italics added.)

## DISPOSITION

The portion of the trial court's September 1, 2009 order invalidating section IV, paragraph H of the parties' premarital agreement—the spousal support waiver—is reversed. We also reverse that portion of the trial court's November 24, 2009 order requiring Michael to pay Pamela spousal support. Otherwise, we affirm the remaining portions of both orders. Michael to recover his costs of appeal.

Haller, J., and McDonald, J., concurred.