Filed 5/28/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of NATALIA and PETER MIOTKE. | H040611, H040972 (Santa Clara County Super. Ct. No. 2010-6-FL-005329) |
| NATALIA ZARUBIN,<br><br>        Appellant,<br><br>        v.<br><br>PETER MIOTKE,<br><br>        Respondent. | |

In March 2013, a private judge retained by the parties in this dissolution action found the premarital agreement they signed in 1996 (PMA) to be enforceable, including the provision waiving spousal support to either party. The trial court denied Appellant Natalia Zarubin's request to set aside the private judge's decision (the set aside order). It then entered a judgment on reserved issues (the judgment) incorporating the PMA, including its waiver of spousal support. On appeal, Natalia[1] asks us to reverse the set aside order and the portion of the judgment denying spousal support.[2] In the unpublished portion of our decision, we conclude the trial court committed no error in upholding the validity of the PMA and issuing the set aside order. In the published portion of the

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II(A)-(D), and (F).

[1] As is traditional in family law cases, for purposes of readability we refer to the parties by their first names.

[2] Natalia separately appealed the set aside order (case No. H040611) and the judgment (case No. H040972). We ordered the cases be considered together for the purpose of briefing, oral argument and disposition.

decision, we determine the trial court properly entered judgment incorporating the PMA and its waiver of spousal support. We affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Circumstances Leading to Premarital Agreement*[3]

Natalia and Respondent Peter Miotke began communicating in 1995; at the time Natalia lived in Russia and Peter in the United States. Both parties were trained architects. All of their correspondence was in English. They first met in person in St. Petersburg, Russia. They met a second time in Houston, Texas, where Natalia was participating in an internship through a cultural exchange program set up by the United States Information Agency in Washington, D.C. To qualify for the program, Natalia had to be proficient in English. In October 1995, Natalia began working for an architectural firm in Houston; she did architectural drafting work in English.

Natalia moved to California in November 1995; she became pregnant with the parties' child in December 1995. During her pregnancy, she worked part-time at Subway sandwiches, doing bookkeeping for the owners. Natalia gave birth to the parties' daughter in September 1996.

After the child's birth, Natalia determined she wanted to remain in the United States. The parties decided to marry. Peter indicated his desire to have a prenuptial agreement; he "secured a paralegal's help." Peter was concerned that Natalia was "scamming" him for money or property. He did not want her to leave the country and "interfere with his property rights." Peter was concerned about having to pay spousal support to Natalia if she lived in Russia.

---

[3] In the absence of a certified reporter's transcript, the facts are mainly derived from the private judge's May 14, 2013 trial decision, entered after a bifurcated trial on the issue of the validity of the PMA. We discuss the inadequacy of the record in our analysis.

2

The parties met with the paralegal and signed the PMA on October 26, 1996. While Peter claimed he obtained a boilerplate agreement from the paralegal on October 17, 1996, and brought it home for Natalia to review, Natalia denied seeing the agreement prior to visiting the paralegal's office. Peter testified the parties had previously discussed a waiver of spousal support and that Natalia would be awarded custody of their children in the event of a dissolution of the marriage. At the time the parties executed the agreement, the "paralegal said that the agreement could be drafted by an attorney and had the parties sign an acknowledgment that the parties knew she was not giving legal advice." The parties agreed "that they went to the paralegal's office to sign the agreement in anticipation of their marriage and that financial disclosures were completed at the paralegal's office."

The PMA consists of four pages, with an additional four pages of financial disclosures attached. Relevant to these appeals, the PMA states, "Both parties agree that in the case of separation or divorce there will be no spousal support owed by either of the parties to the other. Both parties are also in agreement that all children will remain in the custody of Natalia Zarubin upon separation or dissolution unless otherwise stipulated and agreed on by legal separation and/or dissolution of marriage." The parties further agreed if one provision of the PMA was held invalid or unenforceable, the remaining provisions would continue to be valid and enforceable.

The parties married on November 14, 1996, 19 days after the execution of the PMA. On March 26, 1997, Peter filed an I-130 "Immigrant Petition for Relative, Fiance(e), or Orphan," which the United States Department of Justice, Immigration and Naturalization Service approved on July 21, 1997.[4] (Capitalization omitted.)

The parties separated in December 2010, after 14 years of marriage.

---

[4] We took judicial notice of the I-130 sponsor's petition for an immigrant spouse and affidavit of support, filed by Peter with the federal government under the Immigration and Nationality Act.

3

### B. Court Proceedings Regarding Validity of the PMA

The trial court acquired jurisdiction over the dissolution in April 2011; it entered a status-only judgment dissolving the marriage in November 2011. In response to Natalia's request for spousal support, Peter asked the trial court to determine the validity of the PMA. At a settlement conference in February 2012, the parties stipulated to retain a private judge, the Honorable Catherine Gallagher (Ret.) to hear all issues in the case except for custody and visitation. She set a separate trial on the issue of the validity of the PMA, including a schedule for exchanging witnesses, exhibit lists, and trial briefs.[5]

Judge Gallagher commenced the trial on the validity of the PMA in September 2012; both parties were represented by counsel during the hearing.[6] Judge Gallagher filed her written ruling on May 14, 2013 (Trial Decision), in which she summarized the issues as follows: "[Natalia] attacks the prenuptial agreement on several grounds. [Natalia] claims that she did not execute the agreement voluntarily, that the agreement is unconscionable given [Natalia's] financial and medical circumstances, including her depression, and that the disclosures between the parties were inaccurate as well as being unfair and unreasonable. [Natalia] further argues that the prenuptial agreement is the product of duress, menace, fraud and/or undue influence. Finally, [Natalia] claims that the agreement is unenforceable because as required in Cal. Fam. Code § 1615 (c), [Natalia] was not represented by counsel when the agreement was

---

[5] The record on appeal contains limited information regarding the evidence and pleadings presented to Judge Gallagher. It includes an unfiled document entitled "Petitioner's Trial Brief," listing the September 6, 2012 trial before Judge Gallagher as the relevant hearing. While there is nothing in the record indicating Natalia filed this brief with Judge Gallagher or served it on Peter prior to the September 2012 trial, the legal arguments it outlines mirror those addressed by Judge Gallagher in her written decision.

[6] At oral argument, Natalia's counsel suggested Natalia represented herself at this trial; the record on appeal contradicts this assertion.

4

signed and she was not given seven calendar days between the time that she was first presented with the agreement and the time the agreement was signed."

Judge Gallagher resolved disputed testimony regarding the circumstances surrounding the signing of the PMA. In particular, she found Natalia not credible with respect to the circumstances surrounding the signing of the PMA. "[Natalia] testified that she was still suffering from the birth of their daughter and that their daughter was sick on the day the prenuptial was signed. . . . [¶] . . . [Natalia] suggested that she was prescribed some very strong medications after her daughter's birth for lacerations, giving the impression that the pills were a narcotic and that she could not drive or breast feed her child while taking the medicine. . . . It is unbelievable that a doctor would prescribe three hundred sixty pills (4 pills a day for 90 days) that were narcotics for pain to a new mother." Although "[Natalia] argues that [the child] was very sickly during the early months of her life and the baby distracted [Natalia] on October 26, 2012 [*sic*][7]. . . . [Peter] believes that the problem with the formula was fixed with the switch to soy milk and that the urinary tract infections didn't occur until December following her birth." "[Natalia's] testimony was, at times, unreliable and lacked credibility. [Peter's] recollection was much more consistent, reliable and credible."

Judge Gallagher further found, "[Natalia] is obviously an intelligent woman. Although English is not her native language, she was capable of understanding the terms of the prenuptial agreement and the effect of the prenuptial agreement on each party. Before their wedding, [Peter] indicated that he wanted a prenuptial agreement and secured a paralegal's help. Neither party was ever represented by an attorney. Both parties agree that they went to the paralegal's office to sign the agreement in anticipation of their marriage and that financial disclosures were completed. The prenuptial agreement was only four pages long, with an additional four pages of financial

---

[7] The context of this statement indicates Judge Gallagher meant to say October 26, 1996, the day the parties signed the PMA, not October 26, 2012.

5

disclosures annexed to the agreement and was not particularly complex." Judge Gallagher found no evidence Natalia lacked the mental capacity to enter the PMA. Nor was there evidence Natalia signed the PMA as a result of "trick or deception."

Judge Gallagher determined the parties "discussed, negotiated, and agreed to" the provision of the PMA waiving spousal support and making custody provisions. She found the PMA "expressed [the parties'] desires at the time of execution. The prenuptial agreement likewise disclosed each party's separate property. While these disclosures were not perfect, the level of disclosure of each sides [*sic*] assets and liabilities was fair, reasonable, and full." Judge Gallagher observed that Natalia was capable of understanding Peter's disclosures. Although Natalia was not working at the time she signed the PMA, Judge Gallagher noted that Natalia disclosed a net worth of $107,000 in her financial disclosures and admitted to owning a condominium in Siberia and stock from her former Russian employer, Gasprom, as well as a checking account. Peter disclosed net worth of $199,500, and testified his salary had increased about $4,000 annually by the time of the hearing. Judge Gallagher opined "the evidence presented does not reveal a significant disparity in the income of the parties and their respective assets at the time they entered into the agreement," noting Natalia's earning history was similar to Peter's. "Accordingly, based upon the record presented, [Natalia] failed to establish any significant inequality of bargaining power, or any surprise or oppression resulting therefrom."

Based on this evidence Judge Gallagher found Natalia voluntarily executed the PMA, which was "not unconscionable when executed." She ruled the PMA was not the result of fraud, menace, duress, or undue influence. Finally, she found the PMA was not subject to the independent counsel and seven-day waiting period requirements of Family Code sections 1612, subdivision (c), and 1615, subdivision (c), because both were

6

enacted after the parties executed the PMA and neither applies retroactively. Judge Gallagher ruled the PMA was enforceable.[8]

### C. *Motion to Set Aside*

Natalia filed a motion to set aside the Trial Decision, which the assigned trial court judge, the Honorable Margaret Johnson, heard. An attorney filed the motion on Natalia's behalf, and appeared with Natalia at the hearing. In her initial pleadings, Natalia cited Family Code section 2120, subdivision (b),[9] Code of Civil Procedure section 473, subdivision (b),[10] and Family Code section 3691,[11] arguing the court should set aside the PMA because it was "unconscionable and inequitable." She did not provide detailed discussion of the application of these statutes to the facts cited in support of her motion. Natalia also argued the PMA was not enforceable because "the essential elements for a contract did not exist at the time of execution." She alleged there was no disclosure of financial information prior to her signing the PMA, and no compliance with Family Code section 1615, subdivision (c)(2), which required a seven-day waiting period, providing time to seek advice from independent counsel.

---

[8] It appears that the parties did not return to the private judge for adjudication of other issues as the trial court thereafter conducted all proceedings.

[9] "It occasionally happens that the division of property or the award of support, whether made as a result of agreement or trial, is inequitable when made due to the nondisclosure or other misconduct of one of the parties." (Fam. Code, § 2120, subd. (b).)

[10] "The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect." (Code Civ. Proc., § 473, subd. (b).)

[11] "The grounds and time limits for an action or motion to set aside a support order, or any part or parts thereof, are governed by this section and shall be one of the following: [¶] (a) Actual fraud. Where the defrauded party was kept in ignorance or in some other manner, other than his or her own lack of care or attention, was fraudulently prevented from fully participating in the proceeding. An action or motion based on fraud shall be brought within six months after the date on which the complaining party discovered or reasonably should have discovered the fraud." (Fam. Code, § 3691, subd. (a).)

7

On October 7, 2013, Natalia filed a declaration discussing her circumstances at the time she signed the PMA, as well as the history of the parties' relationship between the signing of the PMA and custody proceedings in 2011. She filed another declaration on October 21, 2013, discussing the state of the disclosures the parties provided each other prior to signing the PMA. She did not describe in either declaration why the information she supplied supported her motion to set aside Judge Gallagher's ruling.

The record indicates Judge Johnson held one or more hearings before November 26, 2013, the final hearing on the set aside motion.[12] A declaration from Peter's counsel states Judge Johnson offered Natalia the opportunity to further brief her set aside request, giving her until November 15, 2013, to file additional pleadings. Having not received anything by November 21, 2013, Peter asked Judge Johnson to decline considering anything filed after that date. At the November 26, 2013 hearing, Judge Johnson established that she had asked Natalia's attorney at the time to file, "something pointing out to me exactly what the grounds were for the set-aside." The judge confirmed she had not received anything in response to that request.

However, Natalia had filed a declaration on the day of the hearing, indicating she had been admitted to the hospital in May 2013 for a mental health disability, which the doctors determined had started in July 2012. She argued she was mentally ill when Judge Gallagher held the trial in September 2012, stating, "I was not able to withstand the trial. I was found not credible by the judge. I did not undergo competency evaluation for my diability [*sic*] before the 09/2012 trial." She asked the trial court to set aside the Trial Decision under Code of Civil Procedure section 473.

Upon learning of this new declaration, Peter's attorney objected to the trial court considering new allegations not pled in the initial pleadings; Judge Johnson sustained the objection. She allowed Natalia's attorney the opportunity to explain the delay in

---

[12] The record does not include minute orders or transcripts from such hearing(s).

8

providing the information prior to the date of the hearing. Judge Johnson then denied the request to set aside the Trial Decision with prejudice, noting Natalia could have notified Peter and the trial court prior to the hearing that she was having difficulty obtaining evidence needed to support her request. On January 14, 2014, Natalia, on her own behalf, filed an additional declaration "in response" to Judge Johnson's denial of the set aside motion. There is nothing in the record on appeal indicating Natalia ever took action to bring her January 2014 declaration to the trial court's attention, or that the trial court ever took action based on the declaration.

On January 21, 2014, Natalia filed notice of her appeal of Judge Johnson's oral order, made November 26, 2013, denying the set aside motion. The trial court filed a written findings and order after hearing confirming that order on January 27, 2014.

### D. February 2014 Trial

The trial court set the case for trial on all reserved issues before the Honorable James Towery commencing February 6, 2014, to reach a final judgment. The attorney who represented Natalia at the September 2012 trial and the November 2013 hearing in limited scope appeared briefly but left once it was determined the trial fell outside the scope of her representation; the attorney indicated Natalia signed and filed a substitution of attorney during a break on the first day of trial, although the substitution of attorney form is not part of the record on appeal.

At the outset, Judge Towery indicated his belief that Judge Gallagher's Trial Decision was the "law of the case" as to issues concerning the validity of the PMA. He understood Natalia had filed an appeal of the set aside order. Judge Towery stated spousal support was not an issue that was under consideration for trial, given Judge Gallagher's ruling that the PMA, and the waiver of spousal support contained therein, was valid. Although Natalia had not filed a pretrial statement, based on her belief a bankruptcy stay in place until the day before the trial precluded her from doing so, the court indicated she could still raise her claims for reimbursements, if she brought in all

9

relevant documents by the next day of trial. Natalia requested a continuance not on the grounds that she did not have representation, but rather based on her belief she could not have a fair and impartial trial before Judge Towery, believing he was denying her request for reimbursements, and because of her medical condition. Judge Towery confirmed Natalia could seek reimbursements. He also confirmed he would allow Natalia appropriate breaks to take medication; he denied any continuance of the trial based on her medical condition, finding she did not provide sufficient evidence of her current condition to support such a request.

When Peter attempted to introduce the PMA into evidence in his case in chief, Natalia objected on the grounds she had filed an appeal. Judge Towery overruled the objection, again noting that Judge Gallagher's Trial Decision was part of the "law of the case" guiding property division. "This is not to say that we are reopening the evidence regarding the prenup or seeking to change Judge Gallagher's ruling in any way, but that ruling is final, and this court views that ruling as being binding on it."

On the second day of trial, February 7, 2014, Natalia filed a "trial statement" and "trial brief." In her statement, Natalia listed spousal support as an issue she wanted the trial court to hear. In her trial brief, Natalia argued that the trial court should order spousal support pursuant to Family Code section 1612, subdivision (c), on the basis her waiver of such support in the PMA was unconscionable at the time of enforcement.[13] Judge Towery reviewed Natalia's brief at the start of the second day of trial, and immediately denied the request for spousal support, again reconfirming that Judge Gallagher upheld the PMA, thus resolving the issue of support based on the waiver

---

[13] Family Code section 1612, subdivision (c) provides, in relevant part, "Any provision in a premarital agreement regarding spousal support, including, but not limited to, a waiver of it, is not enforceable if the party against whom enforcement of the spousal support provision is sought was not represented by independent counsel at the time the agreement containing the provision was signed, *or if the provision regarding spousal support is unconscionable at the time of enforcement*." (Italics added.)

10

contained therein. "[This] issue has been litigated. It is resolved and we're not going to relitigate it."

Despite this ruling, near the end of the second day, Natalia reiterated her request for spousal support under Family Code section 1612, subdivision (c), so that she could avoid becoming a "public charge." Judge Towery once again denied her request. "[T]his court has ruled probably a half a dozen times that spousal support is not an issue that we are resolving today. [¶] The spousal support issue was litigated to finality in the prenuptial litigation before Judge Gallagher. Judge Gallagher issued her order. Judge Johnson refused to order a set-aside of Judge Gallagher's order. You filed a notice of appeal. That issue is not before us. . . . [¶] . . . [¶] With respect to 1612(c)—that's of the Family Code—that is a statute that governs matters that can be covered by a prenuptial agreement. Any issues that you have regarding that statute could have been and should have been litigated in the matters before Judge Gallagher regarding the prenuptial agreement. I don't have a transcript of what happened there, but I do know that they're not part of this litigation."

Judge Towery continued the trial for a third day of proceedings on February 11, 2014. Notwithstanding his previous rulings regarding spousal support, the issue came up again, with regard to a pending request for child and spousal support set for hearing on February 20, 2014. Judge Towery reconfirmed that the issue of spousal support was "closed" based on Judge Gallagher's Trial Decision, and Judge Johnson's denial of the set aside motion. Natalia conceded she did not put the issue of section 1612, subdivision (c) before the court.

At the hearing on February 20, 2014, Judge Towery again denied Natalia's request for spousal support. "This Court has specifically found that the order issued by Judge Gallagher pertaining to the parties' premarital agreement controls the issue of spousal support in that both parties waived spousal support in the premarital agreement and that agreement has been upheld as valid. [Natalia], in this and other requests, has failed to

11

state a legal basis on which the order made by Judge Gallagher should be overturned or on which spousal support could be ordered. [Natalia's] citation of Family Code Section 1612 is inapplicable to this request."

On March 4, 2014, the trial court filed a written judgment on reserved issues adopting the rulings made throughout the February 2014 trial. The box on the Judicial Council form *Judgment* (FL-180) was checked indicating jurisdiction over spousal support was terminated as to both parties. "The Court finds that the premarital agreement executed by the parties prior to marriage included a waiver of such support by both parties and that the Trial Decision of Judge Gallagher filed on May 14, 2013 found the premarital agreement, including the waiver of spousal support, to be conscionable and valid. Based on this finding, this Court, and any other Court, is divested of the jurisdiction to award spousal support to either party."

Natalia filed notice of her intention to move for a new trial on March 7, 2014, which was denied by the trial court on April 29, 2014. On April 30, 2014, Natalia filed notice of her appeal of the judgment.

## II. DISCUSSION

### A. Timeliness of Appeal

Peter asks the Court to dismiss Natalia's appeal on the grounds she did not file her notice of appeal within 180 days of Judge Gallagher issuing her Trial Decision. In reality, when Natalia filed her initial appeal of the set aside order (case No. H040611), it was premature; the Trial Decision was not, by itself, appealable, as it was a ruling on a bifurcated issue made prior to the final judgment, and the trial court did not issue a certificate of probable cause.[14] (Code Civ. Proc, § 904.1, subd. (a)(1); Fam. Code,

---

[14] At the November 26, 2013 hearing, Judge Johnson indicated Natalia had the right to appeal her ruling or file a writ. This does not meet the requirements for a certificate of probable cause. (Cal. Rules of Court, rule 5.392(b).)

12

§ 2025; Cal. Rules of Court[15], rule 5.392(b).)  As the Trial Decision was not appealable, the set aside order was not immediately appealable.  (*Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 680 (*Garcia*).)  Both the Trial Decision and the set aside order became appealable once the trial court entered the February 2014 judgment.  (Code Civ. Proc., § 904.1; see rule 5.392(h)(1), (3); *Garcia*, *supra*, 58 Cal.App.4th at p. 680.)  We therefore deem Natalia's appeal of the set aside order filed on the date of the judgment.  She timely filed her notice of appeal of the judgment (case No. H040972).  Therefore, we deny Peter's request to dismiss the appeal.

### B. *Inadequacy of Record/ New Issues Raised on Appeal*

At the outset, we note deficiencies in the record on appeal.  Natalia's arguments require this court to evaluate the proceedings in the trial court, in particular proceedings conducted by the stipulated private judge.  Natalia has the burden of ensuring we have a sufficient record on which to assess her claims.  (*Foust v. San Jose Construction Co., Inc.* (2011) 198 Cal.App.4th 181, 187 (*Foust*).)  The limited documents in the record pertaining to the trial on the PMA suggest Natalia did not raise many of the arguments now made on appeal at the time that judge evaluated the validity of the agreement.  Natalia did not provide a transcript from the trial held by that judge in September 2012.[16]

As a general rule, in order to raise issues on appeal, Natalia had to first raise them in the trial court.  (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 603 (*Johnson*).)  "The general rule against new issues is subject to an exception that grants appellate courts the discretion to address questions not raised in the trial court when the theory presented for the first time on appeal involves only a legal question determinable from facts that are

---

[15] All subsequent references to rules of court are to the California Rules of Court.

[16]  In her opening brief, Natalia indicates "no transcript is available," and thus concedes we will presume the evidence presented at trial was sufficient to support the private judge's factual findings.  The record on appeal suggests a court reporter may have been present at that trial; Peter sought reimbursement for payments he made to the court reporter.

13

(1) uncontroverted in the record and (2) could not have been altered by the presentation of additional evidence." (*Esparza v. KS Industries, L.P.* (2017) 13 Cal.App.5th 1228, 1237-1238 (*Esparza*).) As discussed below, we decline to consider issues Natalia raises for the first time in this appeal.

### 1. *There is No Evidence Natalia Raised Certain Claims with Judge Gallagher*

As discussed in her opening brief, Natalia recognizes the limits of the record concerning the trial held before Judge Gallagher, as there is no reporter's transcript of that hearing in the record on appeal. The only information we have from that hearing is the stipulation placing the issues before Judge Gallagher, a case management order setting the trial and briefing schedule, the brief Natalia presumably provided to Judge Gallagher prior to the trial, and the resulting Trial Decision. Assuming Natalia did provide the pretrial brief to Judge Gallagher, it represents some minimal evidence of the arguments she made at the September 2012 trial. Comparing those arguments to the ones Natalia makes in the instant appeal, it does not appear she raised most of her arguments on appeal to Judge Gallagher. Ultimately, Natalia has not designated a sufficient record on appeal for us to determine whether she raised most of her claims to Judge Gallagher, the judicial officer evaluating the enforceability of the PMA.

"[A] judgment or order of the trial court is presumed correct and prejudicial error must be affirmatively shown. [Citation.] 'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court. "[I]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented." ' [Citation.] . . . ' "A necessary corollary to this rule is that if the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed." ' [Citation.] 'Consequently, [appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an

14

issue requires that the issue be resolved against [appellant].' [Citation.]" (*Foust*, *supra*, 198 Cal.App.4th at p. 187.) We examine the record before us in light of this rule.

On appeal, Natalia raises four arguments in her opening brief unsupported by any record designation indicating they were raised in the hearing before Judge Gallagher. There is nothing in the record indicating Natalia asked Judge Gallagher to determine whether there was a failure of consideration because the custody and visitation provision of the PMA was invalid or unenforceable, or whether the custody and visitation provision was severable from the rest of the agreement.[17] Nor is there evidence in the record Natalia asked Judge Gallagher to determine whether the PMA was unconscionable at the time of enforcement, versus at the time of execution. There is nothing in the record indicating Natalia argued Judge Gallagher should find the PMA invalid because it did not consider the waiver of spousal support in light of Family Code sections 4320-4326. Finally, there is nothing indicating Natalia asked Judge Gallagher to consider the alleged history of domestic violence in the parties' relationship relative to the enforceability of the PMA.[18]

---

[17] Shortly before oral argument, Natalia filed a request to strike her opening brief and replace it with a new brief, conceding that "[c]hild custody provisions were not before the court at the time of decision, the designated proceedings on appeal do not include all of the testimony, and the notice on appeal does not state child custody provisions to be raised on appeal," such that it was "appropriate to withdraw the argument" regarding the impact of custody provisions on the enforceability of the waiver of support. As discussed in more detail in footnote 23, *post*, we denied her motion.

[18] The record does indicate Natalia's attorney at the time brought up issues concerning the custody provision of the PMA and the alleged history of domestic violence before Judge Johnson in a November 2011 trial, although only in pretrial discussions and testimony, and not in argument. Judge Johnson started, but did not complete, a trial on the validity of the PMA; the parties then stipulated to have a private judge hear the matter. Different attorneys represented Natalia at the November 2011 and September 2012 trials. We cannot discern from the record whether the attorney representing Natalia at the later trial raised the same issues as her attorney at the earlier trial, particularly as these issues are not referenced in the pretrial brief or Judge Gallagher's Trial Decision. Judge Gallagher does not suggest in the Trial Decision that

15

In her first supplemental brief, Natalia argues the PMA was unconscionable at the time of enforcement because it left her a "public charge."[19]  As with the arguments cited *ante*, there is no evidence in the record Natalia raised this contention with Judge Gallagher.  Nor did Natalia designate a sufficient record to determine whether she raised these issues to the trial court at the time of enforcement of the spousal support waiver, which was at the trial before Judge Gallagher.  (See Section II(E)(1), *post*.)  As it was Natalia's burden to provide the necessary record, we resolve the issue against Natalia and assume she did not raise the issues before Judge Gallagher.  (*Foust*, *supra*, 198 Cal.App.4th at p. 187.)  These issues do not involve "legal questions determinable from facts that are (1) uncontroverted in the record and (2) could not have been altered by the presentation of additional evidence."  We therefore find it unnecessary to exercise our discretion to consider these new issues on appeal.  (*Esparza*, *supra*, 13 Cal.App.5th at p. 1238.)

### 2. *Natalia Did Not Raise Issues Regarding the Affidavit of Support to the Trial Court*

In her second supplemental brief, Natalia argues Peter signed an affidavit of support when he submitted a form I-130 immigration petition for Natalia to obtain a

---

the parties offered the November 2011 trial transcript into evidence at the September 2012 trial.

[19] In response to both Natalia's first and second supplemental briefs, Peter asks us to "dismiss" the supplemental briefs, as they are not limited to new legal authorities or new legislation not available at the time of her initial brief.  In doing so, Peter cites rule 8.520(d), which applies to supplemental briefing in the Supreme Court.  There is not a similar rule for supplemental briefs in Court of Appeal proceedings.  (See rule 8.200 et seq.)  We allowed Natalia to file the first supplemental brief to address the clerk's transcript not yet available at the time she filed her opening brief; that is what she did.  We allowed the second supplemental brief to address relatively new legal authority.  There is no prejudice to Peter in our consideration of Natalia's first and second supplemental briefs, given our rulings in this opinion.

visa.[20]  Under 8 Code of Federal Regulations part 213a.2(e), certain petitioners are required to submit an affidavit of support in order to obtain visas for spouses and other relatives.  In his response to the second supplemental brief, Peter does not deny signing such an affidavit.  Natalia contends the trial court erred in upholding the PMA, denying her request for spousal support, and terminating the court's jurisdiction over such support because Peter has a distinct and independent obligation to provide her spousal support under the federal regulations governing the issuance of her visa to remain in the United States.

Neither of the cases Natalia relies on allow her to raise these arguments for the first time on appeal.  In *Kumar*, the appellate court confirmed that the right to support under an affidavit of support signed for immigration purposes is distinct from the right to support afforded by the Family Code.  (*Kumar*, *supra*, 13 Cal.App.5th at p. 1081, citing *Erler v. Erler* (9th Cir. 2016) 824 F.3d 1173, 1177 (*Erler*).)  There, the immigrant spouse raised the issue of support under the affidavit throughout the dissolution proceedings.  (*Kumar,* at pp. 1076-1078.)  On appeal, she cited the affidavit, rather than the state statutes, as the basis for seeking support.  (*Id*. at p. 1082, fn. 9.)  The trial court explicitly denied the spouse's request to enforce the affidavit, indicating it would only do so if the government sought enforcement.  (*Id*. at p. 1078.)  The Court of Appeal reversed, finding the trial court incorrectly denied the spouse's contract claims on the ground she lacked standing to enforce the I-864 affidavit.  (*Id*. at p. 1083.)  However, nothing in the decision

---

[20] The affidavit of support is not part of the record on appeal; Natalia submitted the notice approving the I-130 petition as an appendix to her second supplemental brief, but she did not include the petition or affidavit.  As noted in footnote 4, *ante*, we took judicial notice of "the I-130 sponsor's petition for an immigrant spouse and affidavit of support, filed by [Peter] with the federal government under the Immigration and Nationality Act."  Peter states he, "signed an Immigration Form I-984 as a family sponsor for [Natalia] during her immigration process."  It appears this form number is a typographical error; later in his response he references form I-864, which is the form at issue in the primary case cited by Natalia, *In re Marriage of Kumar* (2017) 13 Cal.App.5th 1072, 1075, review denied (Oct. 18, 2017) (*Kumar*).

indicates the court in *Kumar* considered the interplay between the affidavit of support and a premarital agreement.

In *Erler*, the immigrant spouse filed an action to enforce her former spouse's obligations under an affidavit of support signed after the parties' married. (*Erler*, *supra*, 824 F.3d at pp. 1175-1176.) The citizen spouse argued the parties' premarital agreement and divorce judgment terminated his obligations under the affidavit. (*Id*. at p. 1176.) The Ninth Circuit Court of Appeals found the district court correctly rejected these arguments. (*Ibid*.) "[U]nder federal law, neither a divorce judgment nor a premarital agreement may terminate an obligation of support." (*Id*. at p. 1177; see *Dorsaneo v. Dorsaneo* (N.D. Cal. 2017) 261 F.Supp.3d 1052, 1054; *Liu v. Mund* (7th Cir. 2012) 686 F.3d 418, 419-420, as amended (July 27, 2012).)

Natalia does not cite any portion of the record on appeal indicating she raised this issue to the trial court at any relevant point in the proceedings, nor do we find evidence she did so in our review of the record. In her reply[21], Natalia notes Judge Gallagher stated, in her Trial Decision, "[Peter] did not believe that their marriage would help [Natalia's] efforts to remain in the United States." This brief statement does not demonstrate Natalia asked the court to consider the affidavit of support in evaluating the validity of the PMA, or that Judge Gallagher took the affidavit into account in issuing the Trial Decision. Natalia did not address the affidavit in the brief she provided to Judge Gallagher prior to the trial.

---

[21] Notably, we did not authorize Natalia to file a reply addressing the immigration issues raised in her second supplemental brief. In the reply, she addresses several factual and legal issues not raised in the second supplemental brief or Peter's response thereto. Given our finding that the issue of the affidavit of support was not properly raised to the trial court before being raised on appeal, we do not believe there is any prejudice in us considering the unauthorized reply, as we do so for the purpose of confirming the appropriateness of that finding.

18

As already discussed, we can consider a theory presented for the first time on appeal if it involves only a legal question determinable from uncontroverted facts that could not have been altered by the presentation of additional evidence. (*Esparza*, *supra*, 13 Cal.App.5th at pp. 1237-1238.) Natalia argues she is entitled to support based on the affidavit of support. Peter contends that his obligation under the affidavit terminated during the marriage. To the extent Natalia does now seek to enforce the affidavit, Peter's response makes it clear the issue of whether he continues to owe Natalia support under the affidavit cannot be determined from facts uncontroverted in the record.

Under 8 Code of Federal Regulations part 213a.2(e)(2), Peter's support obligation terminates by operation of law on the happening of certain events, such as the immigrant spouse obtaining United States citizenship, or when the immigrant spouse has worked, or can be credited with, 40 qualifying quarters of coverage under the Social Security Act, among other things. (8 C.F.R. § 213a.2(e)(2).) Peter alleges Natalia became a citizen during the marriage, such that his obligation under the affidavit of support ended before the dissolution proceedings began. Moreover, he argues Natalia was able to work and support herself after the filing of dissolution, suggesting there could be a dispute regarding her coverage under the Social Security Act.

Based on Natalia's reply to Peter's arguments, it seems she is not necessarily seeking to enforce the affidavit. Rather, she believes Peter signing the affidavit of support constituted a waiver of his rights under paragraph 8(d) of the PMA, and thus granted Natalia the right to seek future support under state spousal support laws, even if he no longer has an obligation to support her under the affidavit of support. Generally citing "contract law," Natalia argues "a party waives a contractual right by intentionally relinquishing the right or engaging in conduct that warrants the inference that the right has been relinquished." But again, the issue of Peter's intent, or any inferences that can by drawn from his conduct, is a factual issue that could be altered by the presentation of additional evidence. Whether Natalia alleges Peter has an ongoing duty to support her

19

under the affidavit of support, or she claims the affidavit of support served to negate the spousal support waiver contained in the PMA, Natalia did not raise either of these arguments to the trial court at any time during the relevant proceedings. Critically, in both *Kumar* and *Erler*, the immigrant spouse raised the affidavit of support in the trial court. By comparison, the record on appeal in the instant matter does not show Natalia made a claim for support under or related to the affidavit in the trial court.[22] Given that the facts are controverted, such that they could be altered by the presentation of additional evidence, we decline to consider Natalia's new arguments on appeal.

### 3. *Natalia's Requests for Judicial Notice*

In March 2019, we set this matter for oral argument on April 9, 2019. Shortly after sending notice of the hearing date, Natalia filed three additional requests for judicial notice. In the first, filed March 21, 2019, she asked us to take notice of pleadings filed with the trial court regarding joinder of an employee benefit plan to the dissolution proceedings. In the second, filed March 25, 2019, she asked us to take notice of a trial exhibit introduced by Peter at the February 2014 trial, a schedule of assets and debts, and an order for disposition of exhibits filed in the trial court. In the third, filed April 2, 2019, she asked us to take judicial notice of the "Decision of Administrative Law Judge, Phillip C. Lyman, Office of Disability Adjudication and Review," issued June 19, 2018, as well as of "a true and certified copy of public records pertaining to [Natalia's] disability history (2013 - current) subject to disclosure under the provisions of the California Public Records Act, Government Code §6250."

In support of the first two requests for judicial notice, Natalia alleges the documents are relevant to the matter on appeal as it pertains to the disposition of the

---

[22] The party seeking such support does not have to file a separate lawsuit; the spouse can seek to enforce the affidavit in a state dissolution proceeding. (*Kumar*, *supra*, 13 Cal.App.5th at pp. 1081-1083.) In *Kumar*, the immigrant spouse did not raise the issue in her response to the operative petition. (*Id*. at p. 1076.) Rather, she first raised it at the initial hearing on temporary spousal support. (*Ibid*.)

parties' assets, in particular qualified employer retirement plans, citing 26 Code of Federal Regulations part 1.401(a)-20, Q&A 28. Natalia did not raise issues concerning the disposition of any assets in her numerous briefs on appeal; nor did she cite to 26 Code of Federal Regulations part 1.401(a)-20, Q&A 28 in her briefs.[23] We can treat as abandoned issues not properly addressed in the briefs. (*Mecchi v. Picchi* (1966) 245 Cal.App.2d 470, 475 (*Mecchi*) [failure to provide points or authorities attacking the judgment deems appeal from that judgment waived and abandoned]; see *Behr v. Redmond* (2011) 193 Cal.App.4th 517, 538; *Lyons v. Chinese Hosp. Ass'n* (2006) 136 Cal.App.4th 1331, 1336, fn. 2.) As Natalia did not raise these issues in her briefs, the documents for which she seeks judicial notice are not relevant to the issues on appeal. We therefore deny the March 21 and March 25, 2019 requests for judicial notice. (See *Doe v. City of Los Angeles* (2007) 42 Cal.4th 531, 544, fn. 4; Cal. Rules of Court, rule 8.252(a)(2)(A).)

In the April 2, 2019 request for judicial notice, Natalia seeks judicial notice of an administrative law judge's decision issued well after the trial court proceedings at issue in this appeal, as well as additional documents for which there is no evidence in the record that they were presented to the trial court, to the extent they existed at the time of the trial court proceedings. We generally cannot consider events that took place after the judgment on appeal; while this rule is somewhat flexible, under the circumstances, Natalia has not provided sufficient reason for us to exercise any discretion we may have

---

[23] On March 29, 2019, we denied Natalia's request made on March 28, 2019, to strike her October 19, 2015 opening brief and file a new brief. Natalia made her request on the grounds she made an argument in the opening brief she no longer believes is appropriate on appeal – "that the denial [of Natalia's] motion for spousal support was reversible error because of unenforceability of waiver of support conditioned on child custody provisions in the prenuptial agreement." However, in the brief Natalia proposed to file in place of the October 2015 opening brief, Natalia raised new issues not included in her other briefs, including discussion of 26 Code of Federal Regulations part 1.401(a)-20, Q&A 28, and seemingly related caselaw. She did not provide any explanation as to why she waited four years and until shortly before oral argument to raise this new issue.

21

to consider this additional evidence.  (See *Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 813; *County of Los Angeles v. Glendora Redevelopment Project* (2010) 185 Cal.App.4th 817, 830-831.)  We therefore deny Natalia's April 2, 2019 request for judicial notice.

### C. *The Evidence in the Record Supports the Validity of the PMA*

Once we remove the issues Natalia forfeited by her failure to show she raised them before Judge Gallagher, we are left with only one viable argument concerning the propriety of the Trial Decision.  Natalia argues Judge Gallagher erred by failing to consider the fact she did not have independent counsel in entering the PMA.  She believes the PMA was unconscionable when it was executed because she did not have an attorney.

We apply a de novo standard of review to the issue of whether the PMA was unconscionable when executed.  (See Fam. Code, § 1615, subd. (b) ["An issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law."]; *In re Marriage of Howell* (2011) 195 Cal.App.4th 1062, 1078 (*Howell*).)  But we defer to any factual findings Judge Gallagher made in reaching her decision so long as they are supported by substantial evidence.  (*Howell*, at p. 1078.)  "We consider this evidence 'in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving conflicts in support of the judgment.'  [Citation.]"  (*Ibid*.)

There is no dispute Judge Gallagher correctly ruled Family Code section 1612, subdivision (c), effective January 1, 2002, does not apply to agreements entered prior to that effective date.  (*Howell*, *supra*, 195 Cal.App.4th at p. 1077.)  That statute requires that a party against whom enforcement of a premarital agreement is sought be represented by independent counsel, or knowingly waive such representation.  (Fam. Code, § 1612, subd. (c).)  On appeal, Natalia argues the state of her representation at the time of execution was still a factor the trial court was required to consider in determining

22

whether the PMA was unconscionable at the time of execution, based on the law in effect in 1996. Natalia claims Judge Gallagher did not consider this factor once she determined Family Code section 1612, subdivision (c) was inapplicable to the PMA.

Lack of representation *is* one factor the trial court can consider in evaluating the unconscionability of a pre-2002 premarital agreement, even though section 1612, subdivision (c) does not apply. (*In re Marriage of Bonds* (2000) 24 Cal.4th 1, 24 (*Bonds*); see *Howell*, *supra*, 195 Cal.App.4th at pp. 1078-1079.) In both *Bonds* and *Howell*, the appellate courts upheld premarital agreements despite the fact the party against whom enforcement was sought did not have independent counsel. Notably, in each of these cases, the party seeking to enforce the agreement had an attorney (*Bonds*, *supra*, at pp. 8-9; *Howell*, *supra*, at p. 1065); in the instant matter, neither Peter nor Natalia had counsel at the time they executed the PMA.

In *Bonds*, the Supreme Court determined the evidence supported the trial court's finding that the wife had adequate opportunity to obtain counsel prior to signing the agreement and elected not to do so because she understood and agreed with the terms. (*Bonds*, *supra*, 24 Cal.4th at p. 35.) The trial court believed the wife could understand the import of the agreement, despite the fact English was her second language; the Supreme Court noted, "for two years prior to marriage she had undertaken employment and education in a trade that required such skills, and before meeting Barry had maintained close personal relationships with persons speaking only English." (*Ibid.*) The Supreme Court found substantial evidence for the trial court's finding that the wife understood the nature of the parties' agreement, even though she had only recently passed her high school equivalency exam "and had little commercial experience," compared to that of the husband, a professional baseball player. (*Id.* at p. 36.) "These circumstances support the inference that any inequality in bargaining power—arising primarily from the absence of independent counsel who could have advised [the wife] not to sign the

23

agreement or urged [the husband] to abandon the idea of keeping his earnings separate—was not coercive." (*Ibid.*)

In *Howell*, the Court of Appeal determined the record supported a finding that the wife knowingly and voluntarily waived her right to spousal support, despite not having independent counsel at the time she executed the agreement. (*Howell*, *supra*, 195 Cal.App.4th at p. 1080.) The wife was advised to retain counsel but elected not to do so "because she believed she could fully protect her rights without counsel." (*Id*. at p. 1078.) The trial court believed the wife had a " 'full understanding' " of the agreement, which was "only 12 pages long, was not particularly complex, involved a small estate, made full disclosure and basically sought to maintain separate the parties' separate property interests." (*Id*. at p. 1079.) The disclosures made by the parties prior to signing were " 'fair, reasonable and full.' " (*Id*. at p. 1080.) "In addition, the court found, and the evidence in the record shows, that there was not a great disparity in the income of the parties and their respective assets at the time they entered into the agreement to establish any significant inequality of bargaining power. [¶] The evidence in the record also supports the trial court's finding that Pamela was employed in the field of bookkeeping, which involves keeping track of finances, and thus was capable of understanding the financial disclosures made by Michael." (*Ibid.*)

The facts before us are similar to those outlined in *Bonds* and *Howell*. Here, the paralegal who prepared the PMA notified the parties it could be prepared by an attorney, and had them acknowledge she was not giving them legal advice. Judge Gallagher found Natalia to be an "intelligent woman"; the record reflects her work experience, including her work as a bookkeeper early in her pregnancy. There is substantial evidence Natalia could understand and communicate in English with ease. Judge Gallagher determined Natalia "was capable of understanding the terms of [the PMA] and the effect of [the PMA] on each party." The PMA is four pages long, with four pages of attached disclosures, described by Judge Gallagher as "not particularly complex." She found no

24

evidence Natalia lacked mental capacity, or that she signed the agreement as a result of trick or deception. Judge Gallagher found the parties' disclosures to be "fair, reasonable, and full," and found Natalia to be capable of understanding Peter's disclosures. She also noted the evidence did not reveal a significant disparity in the parties' incomes and assets at the time they signed the PMA, given Natalia's earning history, such that there was no "significant inequality of bargaining power."

Based on the above, we find substantial evidence in the record supporting Judge Gallagher's factual determinations and her conclusion that both Peter and Natalia voluntarily waived any right to spousal support. Applying the relevant law de novo to those facts, we find Natalia's lack of independent counsel did not render the PMA unconscionable. We uphold the Trial Decision and its finding that the PMA is enforceable.

### D. *The Trial Court Did Not Err in Denying the Set Aside Motion*

While Natalia noticed her appeal of the set aside order, she does not cite any legal or factual basis to reverse that order in any of the briefs she filed with this court. She focuses her briefs on the Trial Decision and February 2014 judgment, electing to forego discussion of the set aside order. The appellant must provide argument and, where possible, citation to legal authority. (Rule 8.204(a)(1)(B).) As we already noted, we can treat as abandoned issues not properly addressed in the briefs. (*Mecchi, supra,* 245 Cal.App.2d at p. 475.)

Even so, a review of the record shows Judge Johnson did not abuse her discretion in denying the set aside motion; abuse of discretion is the standard of review we apply to such an order. (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 257.) "A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*).) "[A] reviewing court, should not disturb the exercise of a trial court's

discretion unless it appears that there has been a miscarriage of justice. . . . 'Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' [Citations.]" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566 (*Denham*).)

Although she cited other statutes in her initial brief supporting her set aside motion, at the hearing on the motion, Natalia's attorney confirmed Code of Civil Procedure section 473, subdivision (b), formed the basis for Natalia's request.[24] None of the pleadings Natalia filed prior to the hearing on the set aside motion specified what "mistake, inadvertence, surprise, or excusable neglect" Natalia believed impacted the Trial Decision as required under that section. (Code Civ. Proc., § 473, subd. (b).) Rather, Natalia argued Judge Gallagher made the wrong decision based on the evidence presented to her at the hearing. Disagreement with the trial court is not a basis to set aside an order under Code of Civil Procedure section 473, subdivision (b); nor is judicial error. (See *Don v. Cruz* (1982) 131 Cal.App.3d 695, 702 ["section 473 has no application to judicial mistakes but only to mistake, inadvertence, surprise or excusable neglect of the moving party"].)

It is clear from the record, Judge Johnson notified Natalia's attorney of the deficiencies in her pleadings prior to the November 2013 hearing. It was not until the day of the hearing that Natalia filed a declaration alleging she was suffering from a disability at the time of the September 2012 trial. Under former rule 5.94(d) (renumbered

---

[24] At the hearing, Natalia's attorney also referenced Code of Civil Procedure section 473, subdivision (c), which concerns penalties the trial court can order when it grants relief under the provisions of Code of Civil Procedure section 473. That subdivision does not set forth separate bases for set aside relief.

to 5.94(c) effective July 1, 2016), the trial court was within its discretion to refuse to consider late-filed pleadings by sustaining Peter's evidentiary objection to the untimely declaration. "We review claims of evidentiary error for abuse of discretion. [Citation.]" (*People v. Luo* (2017) 16 Cal.App.5th 663, 677.)

Prior to the hearing, Peter's counsel noticed an objection to the court considering anything filed after November 21, 2013. His attorney reiterated the objection on the record at the hearing. As Judge Johnson pointed out at the November 2013 hearing, Natalia could have informed the court ahead of time regarding difficulties obtaining necessary evidence to support her claim; she did not. Moreover, at the hearing, Natalia's attorney did not seek a continuance or other relief to account for the untimely declaration. The pleadings Natalia filed prior to November 26, 2013, did not put Peter or the trial court on notice that she would argue her mental health condition affected the September 2012 proceedings, and did not afford Peter the opportunity to investigate and respond to Natalia's claims. Based on this, Judge Johnson's decision not to consider the late-filed declaration was not an abuse of discretion; it did not "exceed all bounds of reason," nor was it "irrational or arbitrary." (*Denham*, *supra*, 2 Cal.3d at p. 566; *Sargon*, *supra*, 55 Cal.4th at p. 773.)

Even if Judge Johnson had considered Natalia's late-filed declaration, the declaration does not provide adequate grounds to set aside the Trial Decision under Code of Civil Procedure section 473, subdivision (b). It does not show that Judge Gallagher entered the Trial Decision as a result of Natalia's mistake, or any inadvertence, surprise, or excusable neglect on Natalia's part. Rather, the declaration indicates that Natalia received treatment starting in May 2013, for a mental health disability that began in July 2012. However, it does not indicate how that disability affected Natalia at the time of the September 2012 trial. In her November 2013 declaration, Natalia states, "I was not able to withstand trial." She does not provide any additional information in support of this statement. Nothing in Judge Gallagher's Trial Decision suggests she had any

27

concerns about Natalia's ability to "withstand trial," despite the detail provided about each party's intelligence and credibility. There is no indication Natalia's attorney retained on limited scope raised any objections or concerns about Natalia's mental health at any time before the trial proceeded in September 2012. The doctor who certified Natalia's disability did not begin treating her until May 2013. Thus, assuming the truth of Natalia's assertions in the declaration, she does not describe how her mental health condition, or her failure to bring that condition to the court's attention, impacted Judge Gallagher's decision.

Additionally, the trial court did not err in failing to take action on the declaration Natalia filed in January 2014, after Judge Johnson issued the set aside order. Natalia did not file a motion for reconsideration, set aside, or any other relief that would have allowed the trial court to revisit the set aside order in January 2014. The mere act of filing the declaration did not serve to bring the issue to the trial court's attention. Natalia was required to comply with rule 5.92 to bring a request before the trial court. At the time Natalia filed her declaration in January 2014, rule 5.92 required the use of the Judicial Council form *Request for Order* (FL-300) to properly raise an issue for hearing. (Former rule 5.92(a)(1) [renumbered to rule 5.92(a)(1)(B) eff. July 1, 2016].) She was required to file the documents with the court to obtain a hearing date, and then serve a copy of the documents on Peter. (Former rule 5.92(a)(6) [renumbered to rule 5.92(b)(5) eff. July 1, 2016].) For all of these reasons, we uphold Judge Johnson's order denying Natalia's motion to set aside the Trial Decision.

### E. The Trial Court Did Not Err in Entering the March 2014 Judgment

In her supplemental brief, Natalia argues the trial court committed reversible error in enforcing the PMA, as doing so made her dependent on public assistance. It appears Natalia argues that the law precluded Judge Towery from denying her request for spousal support at trial because circumstances occurring *after* Judge Gallagher entered the Trial Decision rendered the PMA unconscionable. She does not cite any legal authority

28

supporting this position. Rather, she cites legal authority indicating the trial court must consider whether a PMA is unconscionable at the time of enforcement, asserting she believes the February 2014 trial before Judge Towery resulting in the judgment, rather than the September 2012 trial before Judge Gallagher, was, in effect, the time of enforcement of the PMA. Natalia does not cite any legal authority in support of this contention. Clearly, Judge Towery did not believe it to be the case; he found the Trial Decision was the "law of the case" at the February 2014 trial, and thus denied Natalia's request to revisit spousal support based on the waiver contained in the PMA. We agree the time of enforcement of the PMA was the September 2012 trial.

### 1. The September 2012 Trial Was the "Time of Enforcement" of the PMA

The question of what constitutes the time of enforcement for purposes of evaluating the unconscionability of the PMA is a question of law, which we review de novo. (See *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 353 ["Pure questions of law decided by the trial court are reviewed de novo by the court of appeal."].) Reviewing Judge Towery's application of the law de novo, we find the time of enforcement of the PMA was the September 2012 trial before Judge Gallagher.

As an initial matter, it is not clear the trial court was required to consider whether the PMA was unconscionable at the time of enforcement. Similar to the other 2002 amendments to the Family Code pertaining to premarital agreements, the provision of Family Code section 1612, subdivision (c) requiring the trial court to consider whether the PMA was unconscionable at the time of enforcement does not apply to premarital agreements entered prior to January 1, 2002. (See *In re Marriage of Facter* (2013) 212 Cal.App.4th 967, 981 (*Facter*); *In re Marriage of Hill & Dittmer* (2011) 202 Cal.App.4th 1046, 1056-1057; *Howell*, *supra*, 195 Cal.App.4th at pp. 1073-1074.) We therefore turn to the law in effect at the time the parties signed the PMA.

The Supreme Court has indicated that "circumstances existing at the time of the enforcement of a [pre-2002] spousal support waiver 'might make enforcement unjust.' "

29

(*Facter, supra,* 212 Cal.App.4th at p. 983, citing *In re Marriage of Pendleton and Fireman* (2000) 24 Cal.4th 39, 53 (*Pendleton*).) However, Natalia cites no case addressing unjust enforcement of a spousal support waiver that actually rests a finding of unconscionability based solely on circumstances existing at the time of enforcement. In *Pendleton*, the Supreme Court explicitly stated it was not deciding whether the circumstances at the time of enforcement made the spousal support waiver unjust. (*Pendleton*, *supra*, at p. 53.) In *Facter*, the Court of Appeal found the waiver was unconscionable at the time of enforcement after first determining it was unconscionable at the time of execution. (*Facter*, *supra*, at p. 983.)

Assuming the trial court in the instant matter could have considered unconscionability at the time of enforcement in evaluating the validity of the spousal support waiver contained in the PMA, we are persuaded by the policy permitting bifurcation of trials that the effective enforcement date of the spousal support waiver occurred at the September 2012 trial before Judge Gallagher, not the February 2014 trial on reserved issues conducted by Judge Towery. "The court may separately try one or more issues before trial of the other issues if resolution of the bifurcated issue is likely to simplify the determination of the other issues." (Rule 5.390(b) [formerly rule 5.175(c)].) Appellate courts discussing the goals of bifurcation contemplate a *final* resolution of the bifurcated issues to aid in the later resolution of other issues. (See *In re Marriage of Macfarlane & Lang* (1992) 8 Cal.App.4th 247, 257; *In re Marriage of Wolfe* (1985) 173 Cal.App.3d 889, 893-894.) The goal of simplifying the determination of other issues by first determining the validity of a premarital agreement would not be served if the parties could argue that the date of enforcement of the agreement was after the date of the bifurcated trial. Thus for purposes of evaluating unconscionability at the time of enforcement, we find the September 2012 trial to be the relevant point in time.

However, as already discussed, Natalia did not raise the issue of unconscionability at the time of the September 2012 trial to Judge Gallagher; Natalia conceded this to Judge

Towery on the last day of the trial resulting in the judgment. As a result, she cannot raise the issue on appeal. (*Johnson*, *supra*, 47 Cal.4th at p. 603.)

### 2. *Judge Towery Properly Adopted the Trial Decision in the Judgment*

Natalia argues circumstances arising after (or because of) Judge Gallagher's Trial Decision render the waiver of support unconscionable. Absent legal authority confirming Judge Towery could reconsider or modify Judge Gallagher's order, he properly adopted that order at the time of the February 2014 trial. Judge Towery noted Natalia's failure to provide supporting legal authority for her argument in the order filed after the February 20, 2014 hearing. Natalia also does not offer such authority in support of her appeal on this issue, despite her having the burden to do so. (Rule 8.204(a)(1)(B); *Mecchi*, *supra*, 245 Cal.App.2d at p. 475.)

In determining whether the trial court can modify or reconsider a mutual waiver of spousal support in a prenuptial agreement because its impact once executed appears unfair to a party, we find it useful to compare the waiver of spousal support in a prenuptial agreement to similar provisions in marital settlement agreements made once a dissolution action is filed that seek to limit modification of support or terminate it entirely. The trial court can modify permanent spousal support orders (those issued pursuant to Family Code section 4320 et seq.) on a showing of a material change in circumstances, unless the parties agree the order is not subject to modification. (Fam. Code, § 3651, subd. (a) and (d); *In re Marriage of Khera & Sameer* (2012) 206 Cal.App.4th 1467, 1475-1476.) However, where the parties to a dissolution action agree that spousal support may not be modified, courts have held that even a material change in circumstances cannot affect that agreement. In *In re Marriage of Hibbard*, after the parties agreed support would not be modifiable except under certain enumerated circumstance, the payor spouse suffered a significant reduction in income due to a disability (PTSD), which was not one of the stated reasons to modify support. (*In re Marriage of Hibbard* (2013) 212 Cal.App.4th 1007, 1011 (*Hibbard*).) In finding the

31

parties' agreement precluded modification, the court noted that such agreements could prevent modification even in "intervening, possibly unfair" circumstances, and warned parties agreeing to nonmodifiable support to "be particularly mindful of all possible circumstances that might warrant a modification or cessation of spousal support, and plan accordingly." (*Id*. at p. 1015.)

The *Hibbard* court cited to other examples where intervening circumstances did not circumvent an agreement that spousal support would be non-modifiable, despite the outcome being "possibly unfair." A wife's receipt of monthly payments on a note for the sale of a residence did not justify reducing spousal support where the parties agreed the sale of the residence would not be considered a change in circumstances. (*In re Marriage of Rabkin* (1986) 179 Cal.App.3d 1071, 1077-1081.) A party cannot obtain modification of support based on the recipient's non-marital cohabitation with another person when the parties agreed support was not modifiable and would terminate only on the recipient's remarriage. (*In re Marriage of Sasson* (1982) 129 Cal.App.3d 140, 146-147.) The concurring opinion in *Sasson* noted, "as unjust, one-sided and warped as such a state of affairs may appear to be, Husband is unfortunately bound by his own marital settlement agreement since Wife's testimony that she has never remarried is uncontradicted." (*Id*. at p. 150.) The *Hibbard* court described the result as "patently unfair," yet confirmed the *Sasson* court made the correct decision in light of the parties' agreement. (*Hibbard*, *supra*, 212 Cal.App.4th at p. 1015.)

Similarly, once the trial court has terminated its jurisdiction over spousal support, it does not have authority to reinstate that jurisdiction based on a change in the parties' circumstances. A change in the supported spouse's cohabitation status cannot serve to extend the trial court's jurisdiction over spousal support. (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 957, as modified (May 19, 2017).) Nor can a "current large disparity in the parties' financial positions" allow the trial court to reinstate its

32

jurisdiction over spousal support once it has terminated pursuant to the parties' agreement. (*In re Marriage of Beck* (1997) 57 Cal.App.4th 341, 343, 347.)

We see no legal basis to distinguish between the enforcement of a premarital agreement to waive spousal support, and a postmarital agreement to do the same. Parties prior to marriage or in dissolution proceedings are entitled to reach agreements about spousal support, and so long as the circumstances surrounding the formation of the agreement are conscionable and lawful, courts will not intervene in the unintended consequences to the parties in the future. From Natalia's perspective, circumstances changed after Judge Gallagher determined the PMA was enforceable. We do not see any legal or factual authority that allowed the trial court to override Judge Gallagher's decision based on that change. We find Judge Towery properly denied Natalia's request for spousal support and affirm the judgment accordingly.

## F. Conclusion

The record is clear three judicial officers carefully considered Natalia's arguments regarding the premarital agreement and the spousal support waiver contained therein. We recognize that the emotional gravamen of Natalia's argument is her assertion that she suffered from a serious mental illness at the time she signed the premarital agreement, and in the subsequent hearings on that issue. Given the nature of her claims, the trial court was in the best position to evaluate her concerns; the three judges before whom she appeared had the opportunity to observe Natalia's conduct and solicit information from her and her attorney, when she appeared with one. We note Judge Towery accommodated Natalia's medical needs, and Judge Johnson in particular allowed Natalia additional time to present her claims, notifying her of the potential defect in her pleadings and affording her the opportunity to supplement her brief. However, on appeal, our duty is to consider whether Natalia has shown a cognizable error; we find she has not.

### III.   DISPOSITION

The set aside order and judgment are affirmed.  In the interests of justice, each party shall bear his or her costs on appeal.  (Rule 8.278(a)(1) and (3).)

_____

Greenwood, P.J.


WE CONCUR:



_____

 Grover, J.








_____

 Danner, J.





Zarubin v. Miotke
H040611, H040972

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No.: 2010-6-FL-005329 |
| Trial Judges: | The Honorable Margaret S. Johnson,<br>The Honorable James J. Towery |
| Attorneys for Appellant,<br>NATALIA ZARUBIN: | Law Office of John E. Stringer<br>John E. Stringer |
| Attorneys for Respondent,<br>PETER MIOTKE: | B.J. Fadem & Associates, APC<br>B.J. Fadem |

Zarubin v. Miotke
H040611, H040972